LEMMON, FREETH, HAINES & JONES, ARCHI-
TECTS, LTD. *v.* UNDERWRITERS AT LLOYDS,
LONDON, W. B. BRANDT & CO., INC. AND SAYRE
& TOSO, INC.

No. 5004.

APRIL 21, 1971.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON,
AND KOBAYASHI, JJ.

OPINION OF THE COURT BY KOBAYASHI, J.

This appeal involves breach of an insurance contract
and damages of $25,159.08 awarded assured-appellee, Lem-
mon, Freeth, Haines & Jones, Architects, Ltd. (hereinafter

"appellee") against appellants, Underwriters at Lloyds of London, W. B. Brandt & Co., and Sayre & Toso, Inc. (hereinafter collectively referred to as "appellants"), in a jury-waived trial. For the purpose of this opinion the relationship between appellants is immaterial, and accordingly they are treated as bearing joint responsibility on the contract in question. However, a detailed summary of the facts brought out at trial is necessary.

## I. FACTS

### A. Background

The origin of this controversy stems from appellants' refusal to defend appellee against a prior claim made by the Schuman Carriage Company Ltd. (hereinafter "Schuman") eventually settled at a cost to the appellee equal to the recovery at trial. Schuman's claim was for damages to its new showroom, part of a building designed by appellee in late 1959 and 1960. About April 1961 when the building had been substantially completed by a contractor, not a party to this suit, leaks began to appear in the showroom roof causing water damage to the interior. Efforts by appellee to remedy the leaks before the grand opening proved futile.

The June 1961 grand opening was attended by Douglas W. Freeth, a named member in appellee's architectural firm. Seeing the obvious stains, Freeth recognized that his firm might well be held responsible for the problem. Also on hand and noting the damage was C. Wayson Williams, an employee of Theo. H. Davies Co., Ltd. (hereinafter "Davies") whose job included public relations work for Schuman. In addition, Williams was Davies' claim manager in their insurance department.

In the past Davies had advised appellee on insurance matters and had recommended and sold appellee the policy

under review here. The coverage of this policy, known as "errors and omissions type," or "discovery" policy, ran from August 16, 1960 to August 16, 1961, and in part insured appellee against any claim arising from "any negligent act, error or omission" committed by appellee during this time. Under this protection the *occurrence* giving rise to a claim had to take place within the insured period. A second requirement called for appellee to "give written notice to the underwriters [W. B. Brandt & Co. and Sayre & Toso, Inc.]" of such occurrence or "of any occurrence which may subsequently give rise to a claim" *before* the policy's expiration.

### B. Davies' Customary Course of Dealing with Appellants, Appellee and Others

Although lacking express authority to bind appellants to a particular risk,[1] Davies sold appellants' insurance policies, billed policyholders and collected premiums. In serving those insured by appellants Davies regularly received notice of claims. Notice often came orally, later followed by a written report submitted to appellants through Davies. When special claims forms were needed, Davies requested these from appellants and forwarded them to the insured.[2] Davies normally began any necessary investigation before the insured returned these forms. In general, local policyholders looked to Davies for assistance in initiating and processing claims actions. As a matter of practice and regular course of dealing, all correspondence in regards to appellants' policies were between Davies and the assured. Appellants at no time corre-

---

1 Regarding a potential policyholder, Davies would contact Lloyds of London, receive a quotation after requesting coverage, and in turn transmit this figure to the client.

2 Appellee received these forms long after August 16, 1961 when its policy expired.

sponded with or required the assured to correspond directly with them. That was so in regards to appellee.

## C. Claim Handling by Williams and Appellee's Oral Notice to Him Before the Policy's Expiration

By 1961 Williams had been managing Davies' claim department for over 10 years. He personally knew Freeth and was aware that appellee carried with Davies an "errors or omissions" policy issued by the appellants. Williams testified however that he was not "aware" that the policy contained a written notice provision and as a result had never intimated that appellee's protection depended upon formal compliance with this requirement.[3]

Furthermore, Williams stated that in dealing with appellee, "Mr. Freeth reported verbally possible errors and omissions to me." Although admitting his memory was a little hazy, Williams "assumed"[4] the policy was in effect when Freeth told him that there might be a claim made against appellee arising out of the design of the Schuman Building.[5]

---

[3] No evidence was adduced showing whether appellee had or had not read the terms of the policy. Neither was evidence adduced as to whether appellee knew or did not know that written notice of claim was necessary within the period of coverage.

[4] In his deposition Williams said he was "quite certain" and "quite positive" the policy was in existence when Freeth discussed with him this claim possibility.

[5] Williams also conflictingly testified that he first spoke with Freeth about this matter "at least a year" after the June 1961 grand opening. However his "hazy memory" is apparent from a deposition statement that he could only guess the date of the grand opening sometime between the years 1959-1961, an event he himself attended.

Based on Freeth's testimony that he gave Williams oral notice before August 16, 1961 and the latter's equivocal confirmation of this fact, the trial court concluded that such notice had come to Davies during the policy period. We support this finding. Frey v. Goebert, 52 Haw. 308, 310, 474 P.2d 537, 538 (1970).

### D. Communications Subsequent to the
### Policy's Expiration

Following August 1961 and several other talks with
Freeth, Davies asked appellee in the Fall of 1962 to submit
a written report to Davies of the leakage problem so that
claim recovery could be had.[6] Appellee's response of Octo-
ber 5, 1962 diagnosed the cause and detailed all unsuccess-
ful efforts to remedy it. At no time during these com-
munications was the policy's written notice requirement
mentioned nor suggestion made that appellee's letter was
submitted in reference to this provision.

Davies then forwarded appellee's report with a cover
letter to appellants requesting necessary claims forms.
These forms came to Davies in appellants' return letter
of October 24, 1962 which regarding their enclosure stated,
"We are setting this matter up under Policy No. * * * for
the reason that the assured apparently first became aware
of an occurrence that might give rise to a claim in the
spring of 1961, and the date of such awareness of a pos-
sible claim, and not the date of error, controls as to the
coverage period applicable. * * *" Sometime after appellee
submitted these forms to Davies appellants denied liability.
Appellants'. stated reason for denying liability was that
the appellee, in answer to one of the questions in the claim
form, to wit: "date of claim or intimation of claim first
made against assured," stated "July 1962." Appellants at
this time did not deny liability because of appellee's failure
to give a written notice as required in the policy.

In view of the above evidence adduced at trial, we find
untenable appellants' assertion that failure to give "the

---

[6] After testifying that he was not aware of the written notice re-
quirement Williams further testified that "in this particular case they
wanted something in writing because I didn't know what happened. I
had to have somebody who had knowledge of what was going on before
I could report it." Williams further testified that his request of Freeth
for a written report was not a demand that Freeth comply with the con-
ditions of the policy.

underwriters" timely written notice of the Schuman roof problem precludes appellee's recovery under the insurance contract.

## II. APPELLANTS ESTOPPED TO DENY DAVIES' AUTHORITY TO RECEIVE ORAL NOTICE

Appellants contend Davies had no authority to receive notice of the leakage condition, and that consequently, appellee's oral statements to Williams prior to August 16, 1961 about the possibility of a Schuman claim cannot constitute notice under the policy. In so concluding appellants attempt to define Davies' posture by the terms "broker," "adjuster," and "soliciting agent." However, whether Davies through Williams had authority for notice purposes so as to charge appellants is not determined by labels but by business practice, custom, course of dealing, or from similar acts acquiesced in by the appellants. 3 COUCH ON INSURANCE § 26:26, pp. 483-485 and § 26:58, p. 528 (2d ed. 1960).

Here appellants permitted Davies to act so as to justify appellee's belief that Davies had authority or apparent authority to receive the oral notice. Appellants further permitted Davies to hold itself out as appellants' representative with apparent authority in all the necessary transactions and correspondence in regards to the policy. The testimony of Davies' own claims manager Williams was that he customarily received oral notice from appellee concerning possible claims. Moreover, Williams knew that appellee deemed itself entitled to the benefits of the policy because Freeth had told him so while the policy was in effect. Based on past insurance dealings Freeth justifiably believed that his statement was sufficient notice and Williams' customary conduct confirmed this reliance. Appellants themselves confirmed such reliance by opening an

account for appellee's claim and forwarding the necessary claim forms. Accordingly, appellants are estopped to deny Davies possessed this authority which it exercised through Williams. *Pagni* v. *New York Life Ins. Co.,* 173 Wash. 322, 350-51, 23 P.2d 6, 16 (1933) ; 3 COUCH ON INSURANCE § 26 : 28, pp. 486-87 (2d ed. 1960).

As evidence that appellants recognized this authority in Davies is their letter of October 24 with the enclosed claim forms. Appellants' letter of October 24 clearly shows that an account was opened for appellee's claim and claim forms were sent to Davies for appellee because of appellants' firm belief that appellee's notice of claim was sufficient and was made within the time prescribed in the policy. Certainly appellants did not consider appellee's report dated October 5, 1962 as notice because this was long after the policy expired.

The purpose of the requirement that appellants be notified in writing of an occurrence that might give rise to a claim is to enable them to make an investigation while the facts are fresh. Appellants' briefs raise this consideration. However, any prejudice which may have occurred was not a result of appellee's failure to notify Davies, who normally did appellants' investigation work, but rather the result of Davies' inaction. For this alleged prejudice appellants themselves must bear responsibility.

## III. DAVIES' CONDUCT EFFECTED A WAIVER OF THE WRITTEN NOTICE PROVISION

Whether a third person has, be he designated "agent" or otherwise, authority to effect a waiver of a written notice provision may depend upon the practice, custom, or course of dealing of this person in accepting oral notice and the insurer's action thereon. *Western Farm Bureau Mutual Ins. Co.* v. *Lee,* 63 N.M. 59, 62, 312 P.2d 1068, 1070

(1957). *Cf. Harnden* v. *Milwaukee Mechanics' Ins. Co.,* 164 Mass. 382, 385-86, 41 N.E. 658, 659 (1895).[7]

Williams' testimony again establishes Davies' practice and custom of receiving oral notice. For over a year following Freeth's conversation with Williams, communications took place between Davies and appellee regarding the Schuman matter. As appellants' representative, Davies' course of dealing with and continuing concern over the leaking roof claim possibility, evidence an intention to waive formal compliance with the written notice provision. Appellants' letter of October 24, 1962 in response to this concern indicates their acceptance and affirmance of Davies' practice.

## IV. FAILURE OF THE TRIAL COURT IN RULING ON APPELLANTS' MOTION TO DISMISS

Following the presentation of appellee's case-in-chief appellants moved to dismiss claiming no right to relief had been shown. The trial judge reserved ruling on this motion, in effect denying it. By proceeding with its evidence in defense, appellants waived the right on appeal to specify as error the denial of their motion. *Low* v. *Honolulu Rapid Transit,* 50 Haw. 582, 585, 445 P.2d 372, 375 (1968).

## V. APPELLEE'S FAILURE TO PLEAD THE THEORIES OF ESTOPPEL AND WAIVER

Appellants also raise as error appellee's failure in its pleading to "set forth affirmatively" the theories of estoppel and waiver as allegedly required by H.R.C.P. Rule

---

[7] *See* 3 COUCH ON INSURANCE § 26:26, pp. 483-485 and § 26:58, p. 528 (2d ed. 1960) ; 14 COUCH ON INSURANCE § 49:790, pp. 249-50 (2d ed. 1965).

8(c).[8] By its terms this rule is inapplicable to the situation at hand because here there was no "preceding pleading" to appellee's complaint. *See also Godoy* v. *Hawaii County,* 44 Haw. 312, 321-22, 354 P.2d 78, 82-83 (1960); *Yuen* v. *London Guar. & Acc. Co. et al.,* 40 Haw. 213, 229 (1953).

## VI. CONCLUSION.

The trial court's findings are sufficiently supported by the evidence. The judgment is therefore affirmed.

*A. Peter Howell (Edward J. Bybee* with him on the briefs, *Hogan, Howell & Rother* of counsel); *Leslie T. Bennett (Bennett, Ornelles & Carroll* of counsel) also on the briefs for defendants-appellants.

*Ronald D. Libkuman (Libkuman, Shimabukuro & Ventura* of counsel) for plaintiff-appellee.

---

[8] H.R.C.P. Rule 8(c), Affirmative Defenses, provides in part: "In pleading to a preceding pleading, a party shall set forth affirmatively * * * estoppel * * * [and] waiver * * *."